## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONALD TURACY,** | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | **Case No.:**  2:22-cv-183 |
| **v.** | : | |
| | : | |
| | : | |
| **DB PIPE, LLC d/b/a DURA BOND PIPE I,** | : | |
| | : | **COMPLAINT IN CIVIL ACTION** |
| *Defendant.* | : | |
| | : | |

Filed on Behalf of Plaintiff:
Donald Turacy

Counsel of Record for this Party:
**J.P. WARD & ASSOCIATES, LLC**

Joshua P. Ward
Pa. I.D. No. 320347

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Telephone:        (412) 545-3015
Fax No.:          (412) 540-3399
E-mail:           jward@jpward.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONALD TURACY,** | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | **Case No.:**  2:22-cv-183 |
| **v.** | : | |
| | : | |
| | : | |
| **DB PIPE, LLC d/b/a DURA BOND PIPE I,** | : | |
| | : | **COMPLAINT IN CIVIL ACTION** |
| *Defendant*. | : | |
| | : | |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Donald Turacy, by and through the undersigned counsel, J.P Ward & Associates, LLC and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendant, DB Pipe, LLC d/b/a Dura Bond Pipe I, of which the following is a statement:

## PARTIES

1.     Plaintiff, Donald Turacy (hereinafter "Mr. Turacy"), is an adult individual who currently resides at 3323 Hermar Court, Murrysville, Pennsylvania 15668.

2.     Defendant DB Pipe, LLC d/b/a Dura Bond Pipe I, (hereinafter "Dura Bond"), is a corporation with a principal place of business located at 301 Fourth Avenue, McKeesport, Pennsylvania 15132 and a headquarters located at 2658 Puckety Drive, Export, Pennsylvania 15632.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper as Mr. Turacy brings this lawsuit under the*.,* the Americans with Disabilities Act of 1990 ("ADA") 42 USC § 12101, *et seq.,* The Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.,* 43 P.S.C.A. § 951*, et seq.,* the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C.§ 2601 *et. seq.,* the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623 *et seq.*, Common Law Wrongful Termination, Violation of the First Amendment of the United States Constitution and 42 U.S.C. §1983.

4.      This Court has supplemental jurisdiction over Mr. Turacy's state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Mr. Turacy is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

6.      Mr. Turacy filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") regarding his allegations and received a Dismissal and Notice of Rights on November 9, 2021. This complaint is now timely filed within 90 days of said notice. A true and correct copy of the Dismissal and Notice of rights is attached hereto, made a part hereof, and marked as Exhibit "A".

## PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS

7.      On or about April of 2018, Mr. Turacy initiated employment with Dura Bond as a Destructive Testing Lab Tech.

8.    Some of Mr. Turacy's job duties included selecting, inspecting, and preparing samples to be analyzed, identifying, and correcting departures from the Quality Systems. However, Mr. Turacy's main job duty while employed with Dura Bond was verifying tests in the lab.

9.    A Destructive Testing Lab Tech has no power to speak in the name of any Pennsylvania or Dura Bond policymaker. Additionally, the position has no input into any decision making regarding the scope and/or nature of Dura Bond functions.

10.    One day, on or about April of 2019, Mr. Turacy was performing his job duties in the lab and came across discrepancies related to the samples that had been utilized for testing pipe. During this period of time, Dura Bond's pipe was discovered to have a very serious welding issue. Essentially, the welds were porous and therefore not up to standard.

11.    Mr. Turacy discovered Lab Technician, Sandy Husok (hereinafter, "Ms. Husok") was mixing samples with previous orders, therefore diluting the orders Mr. Turacy had been responsible for checking.

12.    Immediately upon making this discovery, Mr. Turacy promptly informed Lab Tech, Jim Hardnick (hereinafter, "Mr. Hardnick") and Lab Recorder and Lead, Rich Rodman, (hereinafter, "Mr. Rodman").

13.    Mr. Turacy stated he was unable to verify where the test sample had originated from and that the related testing appeared to be falsified. As a result, the samples of pipe were deemed invalid and no longer able to be used as test samples.

14.    Therefore, Mr. Turacy asked Mr. Hardnick for another sample to compare data. Ms. Husok overheard the conversation, at which time she began to yell and swear at Mr. Turacy for

bringing the discrepancies to the attention of Administrator, Joe Ambrose (hereinafter, "Mr. Ambrose"), who responded to and witnessed this incident.

15.     As a result, Mr. Turacy received a disciplinary write-up, because of a verbal altercation that occurred immediately following his accusations against Ms. Husok for falsifying tests.

16.     Three hours later, Mr. Ambrose returned to the lab where he and Mr. Rodman got into a verbal altercation with one another, apparently over the fact that Mr. Turacy was improperly written up.

17.     Mr. Rodman stated he was upset Mr. Ambrose had overstepped his bounds due to Mr. Rodman's position as Lab Lead.

18.     The following day, Mr. Turacy observed Ms. Husok utilizing the same, falsified samples that they had been instructed to discard and purge from the lab.

19.     Mr. Turacy promptly removed the samples from Ms. Husok and placed them back on the desk, at which time Ms. Husok became increasingly hostile and once again began cursing at Mr. Turacy. Ms. Husok contacted the union president concerning the matter and informed Mr. Turacy to "keep his distance."

20.     Following these incidences, no formal investigation or corrective action was taken in regard to the falsified tests.

21.     Rather, Mr. Turacy was informed of his inability to conduct further testing while Ms. Husok was removed from working in the lab with Mr. Turacy.

22.     Ms. Husok was promptly awarded a raise and a promotion.

23.    Upon information and belief, Dura Bond provided Ms. Husok with a promotion in order to ensure her secrecy concerning the falsified samples and the alleged millions of dollars of porous, substandard pipe placed into the stream of commerce by Dura Bond.

24.    Further, following the discipline over the falsified test and substandard product, Mr. Turacy filed a union grievance. Mr. Turacy was informed his write-up would be expunged.

25.    Immediately after discovering the fraudulent testing and filing a grievance, Mr. Turacy began to experience heightened scrutiny in the workplace.

26.    One day, Mr. Turacy misplaced his timecard. Mr. Turacy promptly contacted Human Resources Manager, Nicole Sigmund (hereinafter, "Ms. Sigmund") to inquire about obtaining a new timecard. Ms. Sigmund instructed Mr. Turacy to continue searching for the missing timecard and explicitly stated not to manually clock-in.

27.    Rather, Ms. Sigmund informed Mr. Turacy that he would be issued a new timecard if he was unable to locate the missing timecard within one or two days.

28.    Additionally, Mr. Turacy reported his misplaced timecard and Ms. Sigmund's instruction to the employee who managed employee timekeeping to ensure his hours would be properly accounted for.

29.    Thereafter, Mr. Turacy was unable to locate his missing timecard.

30.    Per Ms. Sigmund's instruction, Mr. Turacy attempted to receive a new timecard on three separate occasions, all of which were unsuccessful due to Ms. Sigmund's absence from the workplace. Three days after his initial request, Ms. Sigmund returned to work and provided Mr. Turacy with a new timecard.

31.    Approximately 30 minutes after receiving the new timecard, Quality Manager, Nate Via (hereinafter, "Mr. Via") reprimanded Mr. Turacy, with Ms. Sigmund present, for not manually

clocking in and issued a disciplinary write-up. Within this conversation, Mr. Via referenced Mr. Turacy's prior write-up, for exposing an individual falsifying test results which led to the implementation of substandard piping into public grounds, to which was promised to be expunged.

32.     Mr. Turacy explained his explicit instruction from Ms. Sigmund not to manually clock-in, to which Ms. Sigmund merely put her head down. Ms. Sigmund refused to explain her prior instructions to Mr. Via.

33.     Later that day, Mr. Turacy attempted to use his new timecard, to which the system would not allow Mr. Turacy to clock out. Mr. Turacy promptly went to Ms. Sigmund's office to request assistance and a manual timecard per Mr. Via's prior instruction.

34.     Upon Mr. Turacy's arrival, Vice President of Operations, Doug Nolfi (hereinafter, "Mr. Nolfi") was present in Ms. Sigmund's office. Mr. Turacy explained the situation and his disciplinary write-up to Mr. Nolfi and Mr. Turacy then requested a manual timecard per Mr. Via's instruction.

35.     Mr. Nolfi informed Mr. Turacy he should not manually clock out as Mr. Via had stated. Rather, Mr. Nolfi advised Mr. Turacy he would personally document his departure for the day.

36.     Thereafter, Mr. Turacy's actions were heavily scrutinized and monitored by Mr. Via, and Mr. Turacy was treated with a great deal of hostility and animosity by his superiors.

37.     On several occasions throughout his employment, Mr. Via made ageist comments to Mr. Turacy and other older employees concerning their retirement and age.

38.     In one instance, Mr. Via stated, "Mike [Mr. Turacy] is waiting on his dad to die."

39.     One day on or about mid-March of 2020, Mr. Via came into the lab to discuss President, Jason Norris's (hereinafter, "Mr. Norris") "Coronavirus Guidance" memo with Mr.

Turacy and Mr. Rodman. Within the memo, it states, "The greater danger is to people with underlying medical conditions such as heart or lung disease, diabetes, compromised immune systems and older adults."

40.    In reference to the memo, Mr. Via stated, "I know you're all older with health conditions, but we don't want to lose people."

41.    Mr. Turacy and Mr. Rodman, both upset by the ageist comment, proceeded to report the discriminatory interaction with Mr. Via to Mr. Nolfi. Rather than attempt to resolve the situation, Mr. Nolfi merely dismissed the report.

42.    Further, one day, Mr. Turacy and Mr. Rodman came across a job posting on an employment search website for a Lab Lead position with Dura Bond.

43.    Following his discovery of the job posting, Mr. Turacy questioned Mr. Nolfi and Mr. Via about the opening.

44.    Additionally, Mr. Turacy expressed his desire to apply for the position due to his experience and qualifications.

45.    Rather than allow Mr. Turacy to apply to the position, he was merely ignored by Mr. Via and informed a new employee had been hired.

46.    Further, Mr. Nolfi informed Mr. Turacy of the new hire's position to allegedly assist the Lab Recorder.

47.    Thereafter, Dura Bond formally hired Lab Lead, Kelly Gerdish, (hereinafter, "Ms. Gerdish"). Ms. Gerdish was a young female who, upon information and belief, had never worked in a mill-setting prior to her initiation of employment with Dura Bond.

48.    Following her formal hiring, Mr. Via held a meeting with Mr. Turacy and Mr. Rodman where they were informed that Ms. Gerdish was their new superior.

49.     Therefore, despite her inexperience in the field, Dura Bond provided Ms. Gerdish with a position superior to that of Mr. Turacy's.

50.     Although Mr. Turacy had a great deal of knowledge and expertise, he was never provided the opportunity to apply for the position to which Ms. Gerdish filled.

51.     Significantly, shortly thereafter, Dura Bond denied Mr. Turacy FMLA leave relating to his disabilities, and rather, advised him to retire.

52.     On or about late March of 2020, Mr. Turacy received a phone call from Mr. Ambrose notifying him of his scheduled return to work on March 31, 2020.

53.     On or about March 30, 2020, Mr. Turacy informed Ms. Sigmund that two of his family members had been exposed to the COVID-19 virus two days prior.

54.     In response, Ms. Sigmund stated Mr. Turacy was permitted to return to the workplace barring any related symptoms.

55.     On or about April 3, 2020, Mr. Turacy provided Ms. Sigmund with a digital copy of his doctor's report via email declaring he be excused from work indefinitely with a start date of March 31, 2020 due to his comorbidities relating to COVID-19. A true and correct copy of the email communication and doctor's report is attached hereto, made a part hereof, and marked as Exhibit "B".

56.     Within the report, Mr. Turacy's physician stated, "due to patient's suppressed immune system, patient is to remain at home until community and local distancing guidelines have changed." *See* Exhibit "B".

57.     Additionally, within the email, Mr. Turacy expressed his desire to return to work as promptly as possible and could have readily returned given reasonable accommodations. *See* Exhibit "B".

58.    Rather than offer any accommodations pursuant to the ADA, Human Resources Director, Sandi Moses (hereinafter, "Ms. Moses") suggested that Mr. Turacy should continue to apply for unemployment benefits.

59.    Mr. Turacy had been collecting unemployment due to Dura Bond's shutdown prior to the onset of COVID-19 as a result of a lack of orders.

60.    Subsequent to this conversation, Mr. Turacy emailed Ms. Sigmund who promptly confirmed receipt of Mr. Turacy's physician's note and reiterated that Mr. Turacy should apply for unemployment compensation.

61.    At no point in time did Ms. Sigmund offer any accommodations pursuant to the ADA or attempt to engage in the interactive process to arrive at a reasonable accommodation for Mr. Turacy.

62.    On April 29, 2020, Mr. Turacy contacted Ms. Sigmund concerning his doctor's reservations regarding Dura Bond's requested doctor's release to return to work.

63.    Mr. Turacy's physician noted the continued stay at home order in place and the repercussions Mr. Turacy could face if exposed to the virus due to his disabilities.

64.    Further, Mr. Turacy stated his physician advised him of his eligibility for the FMLA Leave Expansion Sick Leave due to his original documentation delineating Mr. Turacy's status as a high-risk individual due to his preexisting health conditions.

65.    In response, Ms. Sigmund stated Dura Bond was exempt from the FFCRA due to its employment of over 500 employees.

66.    Thereafter, Mr. Turacy requested a meeting with management to discuss his other leave options, as he was deemed unable to safely return to work by his doctor.

67.     On May 15, 2020, Mr. Turacy had a meeting with Mr. Nolfi and Metallurgist and Director of Quality, Sarang Muley (hereinafter, "Mr. Muley") to discuss his leave options.

68.     During the meeting, Mr. Turacy reiterated his physician-ordered shelter in place order and his subsequent inability to obtain a work release.

69.     At no time did Dura Bond attempt to accommodate Mr. Turacy for his disabilities or inform him of his FMLA leave options.

70.     Rather than allow Mr. Turacy to utilize FMLA leave, Dura Bond merely informed Mr. Turacy of its exemption from the FFCRA and denied him any leave options.

71.     As a result, Mr. Turacy was forced to terminate his employment with Dura Bond and therefore, constructively discharged.

72.     Upon information and belief, Dura Bond withheld information concerning Mr. Turacy's right to FMLA leave as a means of forcing Mr. Turacy to terminate his employment with Dura Bond.

73.     Therefore, Dura Bond denied Mr. Turacy benefits to which he was entitled to under the FMLA and subsequently caused his constructive discharge.

**COUNT I**
**DISCRIMINATION IN VIOLATION OF**
**THE ADA AND THE PHRA**

74.     Mr. Turacy incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

75.     The inquiry into whether a person is disabled under the ADA is made on a case-by case analysis. *Tice v. Centre Area Transport Authority*, 247 F.3d 506 (3rd Cir. 2001). To establish a prima facie case of discrimination under the ADA, Mr. Turacy must show: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential

functions of his job, with or without reasonable accommodations by the employer; and (3) he suffered an otherwise adverse employment decision as a result of discrimination. See *McGlone v. Philadelphia Gas Works*, 17-1399, 2018 WL 2193658, at \*2 (3d Cir. May 14, 2018) (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)

76.     The PHRA is modeled similarly to the ADA and shares similar burdens. The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds. *Bialko v. Quaker Oats Co.*, 434 F. App'x. 139, 142 n.5 (3rd Cir. 2011) (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (noting that the PHRA, in all "relevant respects," was "basically the same as the ADA" and was interpreted "in accord" with the ADA and related case law, thus meaning that "disposition of [Mr. Turacy's] ADA claim applie[d] with equal force to his PHRA claim."

77.     Mr. Turacy is readily disabled within the meaning of the ADA, as he suffers with uncontrollable diabetes and arthritis.

78.     Mr. Turacy was qualified to perform the essential functions of his position, as he satisfactorily performed his job duties and never received any performance-related writeups.

79.     Although Dura Bond was in receipt of Mr. Turacy's doctor's note delineating the reservations surrounding his disabilities and the repercussions he could face if exposed to the virus in the workplace, Dura Bond denied Mr. Turacy any form of leave or reasonable accommodations in the workplace to ensure his safety.

80.     Thereafter, Mr. Turacy was constructively discharged from his employment as a result of Dura Bond's discrimination of Mr. Turacy due to his disabilities.

81.     Dura Bond refused to accommodate Mr. Turacy in the workplace or grant him FMLA leave as related to his disabilities and heightened susceptibility to COVID-19 as stated in the provided doctor's note.

82.     Therefore, the circumstances surrounding Mr. Turacy's constructive discharge, including Dura Bond's awareness of his disabilities, refusal to accommodate Mr. Turacy as ordered by his physician, and his ultimate constructive discharge as a result all corroborates the discriminatory animus present to Dura Bond's actions.

83.     Therefore, Mr. Turacy suffered the ultimate adverse employment decision in the form of the constructive discharge of his employment.

84.     As a direct and proximate cause of the aforementioned conduct, Mr. Turacy suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

85.     As set forth hereinabove, Dura Bond's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience, such that the imposition of punitive damages are appropriate.

WHEREFORE, Plaintiff, Mr. Turacy hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Turacy requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, and reasonable attorney's fees and costs.

## COUNT II
## FAILURE TO ACCOMMODATE IN
## VIOLATION OF THE ADA AND THE PHRA

86.     Mr. Turacy incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

87.     To prevail on a claim of failure to accommodate, a plaintiff must establish that "(1) the employer knew about his disability; (2) he requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist him in seeking accommodations; and (4) he could have been reasonably accommodated but for the employer's lack of good faith." *Tourtellotte v. Eli Lily & Co.*, 636 F.App'x 831, 849 (3d Cir. 2016) (internal citations omitted)

88.     On or about April 3, 2020, Mr. Turacy provided Dura Bond with a doctor's report declaring he be excused from work indefinitely with a start date of March 31, 2020 due to his disabilities placing him at a higher risk of the deadly contraction of COVID-19.

89.     Rather than offer any accommodations pursuant to the ADA, Ms. Moses informed Mr. Turacy to continue to apply for unemployment benefits.

90.     On April 29, 2020, Mr. Turacy contacted Ms. Sigmund concerning his doctor's reservations regarding Dura Bond's requested doctor's release to return to work, as he was deemed unable to safely return to work by his doctor.

91.     Mr. Turacy explicitly requested the reasonable accommodation of FMLA leave as advised by his physician.

92.     In lieu of engaging in the reasonable accommodations process by allowing Mr. Turacy to invoke FMLA leave as ordered by his physician or attempt to implement safeguards in the workplace to ensure Mr. Turacy's safety, Dura Bond refused to be of any assistance.

93. At no point in time did Dura Bond offer any accommodations pursuant to the ADA or attempt to engage in the interactive process to arrive at a reasonable accommodation for Mr. Turacy.

94. Instead, Dura Bond merely informed Mr. Turacy of its exemption from the FFCRA and denied him any leave options available to him under the FMLA.

95. Dura Bond could have easily accommodated Mr. Turacy and Mr. Turacy offered numerous measures to which he could have been accommodated.

96. However, Dura Bond outwardly and explicitly refused to entertain the idea of accommodating him.

97. Dura Bond's failure to make a good faith effort to assist Mr. Turacy by forced him to terminate his employment to protect his health.

98. Mr. Turacy could have been readily and reasonably accommodated by Dura Bond, however Dura Bond failed to provide even a modicum of good faith or a willingness to engage in the accommodations process.

99. As a direct and proximate cause of the aforementioned conduct, Mr. Turacy suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

100. As set forth hereinabove, Dura Bond's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience, such that the imposition of punitive damages are appropriate.

WHEREFORE, Plaintiff, Mr. Turacy hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Turacy requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-

judgment and continuing interest as calculated by the Court, and reasonable attorney's fees and costs.

**COUNT III**
**FMLA RETALIATION**

101.    Mr. Turacy incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

102.    In order to prevail on a claim of retaliation under the FMLA, one must prove that: "(1) he invoked her right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights." *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)

103.    Mr. Turacy is an FMLA-eligible employee under 29 U.S.C.A. §2611(2).

104.    Dura Bond is an employer pursuant to 29 U.S.C.A. §2611(4).

105.    Therefore, Mr. Turacy was entitled to leave pursuant to the FMLA.

106.    Mr. Turacy attempted to invoke his right to FMLA-qualifying leave on several occasions, all of which were denied by Dura Bond.

107.    Mr. Turacy informed Dura Bond of his heightened susceptibility to COVID-19 due to his disabilities and stated his physician advised him of his eligibility for FMLA.

108.    Rather than allow Mr. Turacy to invoke FMLA leave, he was merely informed that Dura Bond was exempt from the FFCRA due to its employment of over 500 employees.

109.    Thereafter, Mr. Turacy requested a meeting with management to discuss his other leave options, as he was deemed unable to safely return to work by his doctor.

110.    Upon information and belief, Dura Bond withheld information concerning Mr. Turacy's right to FMLA leave as a means of forcing Mr. Turacy to terminate his employment with Dura Bond.

111.    Therefore, Dura Bond denied Mr. Turacy benefits to which he was entitled to under the FMLA and subsequently caused his constructive discharge.

112.    Mr. Turacy's constructive discharge, indeed, the ultimate adverse employment action, occurred following Mr. Turacy's several attempts to invoke FMLA leave as ordered by his physician due to his status as a high-risk individual related to his preexisting health conditions.

113.    The two main factors relevant with respect to establishing a causal link to satisfy the prima facie case of retaliation under the FMLA are: (1) timing and/or (2) evidence of ongoing antagonism. *Sabbrese v. Lower's Home Center's Inc.*, 320 F. Supp. 2d 311 (W.D. Pa. 2004).

114.    Due to the temporal proximity of the actions taken by Dura Bond, there is more than an inference, and in fact a direct causal relationship between the forced termination of Mr. Turacy's employment and his attempted invocation of his FMLA rights as related to his disabilities.

WHEREFORE Plaintiff, Mr. Turacy, respects that this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Turacy requests that this Court award back pay, front pay, any other compensatory damages and liquidated damages as calculated by the Court, and costs reasonable attorney's fees and any other relief as this Court sees fit.

## COUNT IV
## FMLA INTERFERENCE

115.    Mr. Turacy incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

116.    The FMLA provides in pertinent part, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights, violation of which is known as FMLA retaliation. *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, at 307 (3d Cir. 2012) (citing to 29 U.S.C. § 2615(a)(1)).

117.    In order to demonstrate a claim for FMLA interference, a Plaintiff must establish: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (citing to *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F.Supp.2d 405, 446 (W.D. Pa. 2008); see also, *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006)).

118.    Moreover, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3rd Cir. 2012).

119.    Under this regulatory interpretation, employers are barred from considering an employee's FMLA leave "as a negative factor in employment actions such as hiring, promotions, or disciplinary actions." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).

120.    Mr. Turacy was employed for a qualified employer under the FMLA and was therefore entitled to leave pursuant to the FMLA.

121.    Mr. Turacy acknowledged and exercised his FMLA rights when he provided Dura Bond with a note from his physician pursuant to his heightened susceptibility to COVID-19 as related to his disabilities and his corresponding inability to safely return to the workplace.

122.    Although not a formalistic standard to invoke rights under the FMLA, employees must give their employer "adequate notice", and in doing so the employee "need not expressly assert rights under the FMLA, or even mention the FMLA." *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, at 303 (3d Cir. 2012) (interpreting the language of 29 U.S.C. § 2612(e)(2) and  29 C.F.R. § 825.303(b)).

123.    On or about May 15, 2021, Mr. Turacy had a meeting with Mr. Nolfi and Mr. Muley to discuss his FMLA leave options.

124.    Rather than allow Mr. Turacy to invoke FMLA leave, he was once again merely notified of Dura Bond's ineligibility for FFCRA leave and denied any and all information concerning his ability to exercise FMLA leave.

125.    Upon information and belief, Dura Bond withheld information concerning Mr. Turacy's right to FMLA leave as a means of interfering with Mr. Turacy's FMLA rights.

126.    Further, Dura Bond's refusal forced Mr. Turacy to terminate his employment with Dura Bond.

127.    Therefore, Mr. Turacy's constructive discharge was the ultimate result of his attempted invocation of his FMLA rights on or about April of 2020.

128.    Between the attempted invocation of his FMLA rights and the adverse employment decision, Mr. Turacy's employer actively interfered with his right to take FMLA leave in direct violation of 29 U.S.C. § 2615(a)(1).

129.    Dura Bond violated Mr. Turacy's rights by interfering with and/or restraining the exercise of Mr. Turacy's FMLA leave in direct violation of 29 U.S.C. § 2615(a)(1).

WHEREFORE Plaintiff, Mr. Turacy, respects that this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Turacy requests that this Court award back pay, front pay, any other compensatory damages and liquidated damages as calculated by the Court, and costs reasonable attorney's fees and any other relief as this Court sees fit.

### COUNT V
### AGE DISCRIMINATION IN VIOLATION
### OF THE ADEA AND THE PHRA

130.    Mr. Turacy incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

131.    To establish a prima facie case of age discrimination, a plaintiff must show that: "(1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis v. UPMC Children's Hospital of Pittsburgh*, 808 F.3d638 at 644 (3rd Cir. 2015).

132.    In cases where a plaintiff is not "directly replaced," this element is met if it can be shown that the employer continued to have a need for an employee to work in the same capacity as the plaintiff. Id. (see *Kroptavich v. Pennsylvania Power and Light Co.*, 795 A.2d 1048, 1058 (Pa. Super. 2002)).

133.    The 3rd Circuit "has determined that the interpretation of the PHRA is identical to that of federal anti-discrimination laws, including the ADEA, [giving rise to] a single analysis for [such] claims under both statutes". Id. at 643.

134.    Mr. Turacy was 56 years old at the time of his termination and was qualified for his position, which is evidenced through his lack of performance-related writeups.

135.    Mr. Turacy was forced to endure ageist comments from Mr. Via throughout his employment.

136.    Upon his report of the discriminatory remarks, no corrective action was taken.

137.    Shortly before Mr. Turacy's forced constructive discharge, Dura Bond hired younger, less-qualified Ms. Gerdish in a supervisory role.

138.   Although Mr. Turacy was qualified for the position, Dura Bond denied him the opportunity to apply for the supervisory position.

139.   Upon information and belief, Dura Bond denied Mr. Turacy the position and hired Ms. Gerdish to replace Mr. Turacy, as Dura Bond planned to force Mr. Turacy terminate his employment shortly thereafter.

140.   Regardless, Dura Bond continued to have a need for an employee to work in the same capacity as Mr. Turacy.

141.   Mr. Turacy was constructively discharged as a result of his age.

142.   Mr. Turacy requested reasonable accommodations due to his preexisting health conditions placing him at a high-risk of the deadly contraction of COVID-19.

143.   Although Mr. Turacy provided Dura Bond with a doctor's note delineating his inability to return to work until the community and local distancing guidelines changed, Dura Bond refused to engage in the interactive accommodations process and merely advised Mr. Turacy to retire.

144.   Upon information and belief, Dura Bond refused to provide Mr. Turacy with accommodations and withheld his leave options as a means of forcing Mr. Turacy to retire from his position due to his age.

145.   As a result, Mr. Turacy claim meets all of the elements necessary to establish age discrimination under the ADEA and PHRA.

WHEREFORE, Plaintiff, Mr. Turacy, hereby requests that this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Turacy prays this Honorable Court award back pay, front pay, compensatory and liquidated damages as authorized by statute, prejudgment and continuing interest, and reasonable attorney's fees and costs.

## COUNT VI
**Common Law Wrongful Termination - Violation of a Clear Mandate of Public Policy**

146.    Mr. Turacy incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

147.    "[A]s a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Mikhail v. Pennsylvania Org. for Women in Early Recovery*, 63 A.3d 313, 316 (Pa. Super. 2013).

148.    However, under a narrow exception to this rule, an employee may bring a cause of action for termination if such termination would violate "a clear mandate of public policy" of the Commonwealth. *Reyes v. Termac Corp.*, CIV.A. 11-5124, 2012 WL 3517372, at *2 (E.D. Pa. Aug. 15, 2012) (citing *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 286 (Pa. 2000)).

149.    "To state a cause of action under the public policy exception to the at-will employment doctrine, a plaintiff must point to a 'clear public policy articulated in the constitution, in legislation, an administrative regulation or a judicial decision.'" *Tanay v. Encore Healthcare, LLC*, 810 F.Supp.2d 734, 737 (E.D.Pa.2011) (quoting *Hunger v. Grand Cent. Sanitation*, 447 Pa.Super. 575, 670 A.2d 173, 175 (Pa. Super.1996)).

150.    This public policy exception applies and permits a cause of action for wrongful discharge where the employer discharges an employee for refusing to commit a crime, where the employer discharges an employee for complying with a statutorily imposed duty, or where the employer is specifically prohibited from discharging the employee by statute. *Deal v. Children's Hosp. of Philadelphia*, 223 A.3d 705, 712 (Pa. Super. 2019) (citing Greco, 199 A.3d at 436; Stewart, 114 A.3d at 428).

151.    Under Pennsylvania laws, it is well-established that pipes used to carry high-pressure natural gas and hazardous materials must be regulated and in compliance with state and

22

federal standards to protect the public from danger. The Natural Gas Pipeline Safety Act of 1968;; 52 Pa. Code § 59.33.

152.    State-regulated activities include the research, development, demonstration, and standardization of activities related to materials inspection, stress and fracture analysis, and fire safety of pipelines. See *Id*.

153.    Indeed, the pipes in question were being supplied to public utilities to house natural gas.  Mr. Turacy was raising concerns that the pipe was substandard and the tests falsified to make it appear that the pipe was cleared by Dura Bond, when in fact it was porous and posed a safety risk to workers and the public at large.

154.    Mr. Turacy explicitly stated his concerns with the unstandarized pipe, as its porosity made it an explosion risk.

155.    Following his good-faith report of a public safety concern, Dura Bond began to retaliate against Mr. Turacy.

156.    Immediately after discovering the fraudulent testing and filing a grievance, Mr. Turacy began to experience heightened scrutiny in the workplace, including a disciplinary write-up, conflicting directives from his superiors, and Dura Bond's refusal to engage in the reasonable accommodations process as related to Mr. Turacy's disabilities.

157.    Dura Bond violated the public policy of the Commonwealth when it retaliated against and constructively discharged Mr. Turacy for making such reports.

158.    As a direct and proximate result of the above-mentioned, Mr. Turacy suffered actual damages, loss of income, lost wages, emotional distress, annoyance and embarrassment.

159.    Dura Bond's actions were knowing, intentional, reckless, and done with conscious indifference to the rights of Mr. Turacy.

WHEREFORE, Mr. Turacy hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Turacy requests this Court award him back pay, front pay, any other compensatory damages, costs, punitive damages, and such other relief as deemed just and proper.

## COUNT VII
### RETALIATION FOR SPEAKING ON A MATTER OF PUBLIC CONCERN IN VIOLATION OF 42 U.S.C. §1983

160.    Mr. Turacy incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

161.    Dura Bond disparately treated and ultimately constructively discharged Mr. Turacy in retaliation for his internal reports and filing of a formal grievance regarding of the utilization of falsified samples and the alleged millions of dollars of porous, unstandardized pipe provided by Dura Bond to public utilities.

162.    By disregarding the porosity of the pipes intended to carry high pressure natural gas, Dura Bond violated Federal, State, and company protocol.  The pipes were an explosion risk.

163.    Mr. Turacy spoke as a citizen on a matter of public concern.

164.    Therefore, Dura Bond terminated Mr. Turacy in violation of his rights to speak freely and to petition for the redress of grievances under the First and Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. §1983.

165.    At all times relevant hereto, Dura Bond acted under color of state law, inasmuch as their acting as set forth at length above, constitute misuse of power possessed solely by virtue of state law and made possible only because Dura Bond is and was clothed with the authority of state law.

166.    Mr. Turacy, as a citizen, has a right to speak on matters of public concern under the First and Fourteenth Amendments of the United States Constitution.

167.    As set forth above, Mr. Turacy was acting as a citizen both speaking upon matters of public concern and petitioning for redress of grievances, therefore, his speech and the action of petitioning are protected under the First and Fourteenth Amendment of the United States Constitution.

168.    Mr. Turacy, as a citizen of the United States, did not surrender his rights and privileges under the United States Constitution as a condition of employment with Dura Bond.

169.    As described above, Dura Bond fired Mr. Turacy in retaliation for his exercise of his First and Fourteenth Amendment right to speak on matters of public concern and to petition for Dura Bond's actions were knowing, intentional, reckless, and done with conscious indifference to Mr. Turacy's federally protected right to exercise her First Amendment rights.

170.    The conduct by Dura Bond, as set forth above, was a conscious choice on the part of Dura Bond to disregard Mr. Turacy's constitutional rights and deprived Mr. Turacy under color of state law, rights of speech, and petition under the First and Fourteenth Amendments of the U.S. Constitution in violation of 42 U.S.C. §1983.

171.    As a direct and proximate result of the above-mentioned breach, Mr. Turacy suffered actual damages, loss of income, lost wages, emotional distress, annoyance and embarrassment.

WHEREFORE, Mr. Turacy hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Turacy requests this Court award him back pay, front pay, any other compensatory damages, costs, punitive damages, and such other relief as deemed just and proper.

**JURY TRIAL DEMANDED.**

Respectfully Submitted,

**J.P. WARD & ASSOCIATES, LLC**

Date: February 1, 2022

By: _____
Joshua P. Ward (Pa. I.D. No. 320347)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Counsel for Plaintiff